## F. D. GLEASON COAL CO. v. UNITED STATES.

Circuit Court of Appeals, Sixth Circuit. January 15, 1929.

No. 5068.

See, also, 14 F.(2d) 233.

Sparkman D. Foster, of Detroit, Mich. (Warren, Hill & Hamblen, of Detroit, Mich., on the brief), for plaintiff in error.

Gregory H. Frederick, Asst. U. S. Atty., of Detroit, Mich. (John R. Watkins, U. S. Atty., of Detroit, Mich., on the brief), for the United States.

Before MOORMAN, MACK, and HICKS, Circuit Judges.

MACK, Circuit Judge. Writ of error to reverse a judgment based on a violation of section 10 of Rivers and Harbors Appropriation Act of March 3, 1899 (33 USCA § 403), charging in two counts unauthorized dredging in the American part of the channel of the St. Clair river, opposite the city of Port Huron, Mich., on September 5th and 24th respectively.

The statute is as follows:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same." 30 Stat. 1151.

Defendant attacked the sufficiency of the indictment by a motion to quash on the ground that it failed to allege that the dredging had altered or modified the course, location, condition, or capacity of the channel. The denial of this motion is not assigned as error, but the same point is raised by the assignment of error in overruling a motion for directed verdict, based upon the lack of proof of this alleged element of the crime. The indictment was properly sustained, and therefore the refusal to direct a verdict on this ground was proper. The statute may be analyzed thus:

"* * * It shall not be lawful to excavate

or fill

or in any manner to alter the course, etc., of any port, etc., or inclosure, or of the channel of any navigable water of the United States."

The clause, "to alter the course * * * of," refers only to acts other than excavating and filling which affect ports, river channels, etc. The only grammatical objection to this construction is that the word "of," preceding "the channel," thereby becomes superfluous. But in construing a statute, the correction of what is apparently merely a misplaced word is common and permissible in order to clarify the obvious sense of a passage; moreover, a similar criticism is applicable to defendant's interpretation. It contends that the statutory language should be wholly rearranged so as to read: "To excavate or fill * * * in any manner *which alters* the course," etc. It is scarcely conceivable that Congress intended to confine its prohibition within such narrow limits, for obviously in very few cases would isolated acts of dredging have a serious effect. The evil to be remedied was the combined effect of many uncontrolled dredgers. Clearly, too, such a limitation would but multiply the difficulties of conviction in even the most extreme cases.

Defendant seeks to raise constitutional doubts; but none exist. While the congressional powers of regulation extend only to matters affecting the navigability of streams, "it does not follow that, because a transaction separately considered is innocuous, it may

not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the government." Purity Extracts Co. v. Lynch, 226 U. S. 192, 201, 33 S. Ct. 44, 46 (57 L. Ed. 184), Ruppert v. Caffey, 251 U. S. 264, 291, 40 S. Ct. 141, 64 L. Ed. 260. If this principle is applicable to innocuous acts merely because they are difficult to exclude from a classification embracing harmful ones, as in Euclid v. Ambler, 272 U. S. 365, 388, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, it is all the more applicable to acts individually innocuous but having a harmful cumulative effect. United States v. Burns (C. C.) 54 F. 351, 365, is not in point, because the statute there involved was specifically directed against obstructions impeding navigation. Compare McMorran Milling Co. v. Little Co., 201 Mich. 315, 167 N. W. 990.

The evidence left no doubt that defendant excavated in a navigable river without official authority; and while there was no direct testimony that the river was navigable at the precise point of excavation, this fact, if necessary, was an inescapable inference from the testimony as to the passage of boats and the location of defendant's dredge. The only issue of fact seriously in dispute was whether defendant's dredge at the times in question was operating on the American or on the Canadian side of the boundary line. Various technical objections are urged by defendant against the testimony and exhibits introduced on this issue.

The prosecution relied upon four witnesses: Thomas, who located the dredge on the days in question westerly of a certain buoy, and testified on the basis of a 47 years' experience as master of a ferry crossing from Port Huron to Canada that all waters west of the buoy were under American jurisdiction; Hyat, who without objection by defendant also located the dredge west of the buoy; Ackerman, who similarly located the dredge and then introduced a government chart, hereinafter described, for the purpose of showing that the proper position for the buoy was on the international boundary line, all waters west of which were American; and Lewis, a surveyor, who testified that the buoy was on the boundary line as found by him a few days after the alleged offenses by triangulations from two official Canadian shore monuments, supplemented by data in a book issued to him by the government and purporting to be the report of the International Boundary Commission.

Defendant strenuously contends that the admission of the chart without further authentication was reversible error. The government's witness testified that it was the standard chart used by government officers and navigators in that region, and that it had been prepared and sold by the Lake Survey office of the War Department. At the trial defendant's final objection was formulated in these words:

"I object to the introduction of Exhibit 4 in evidence, if it is to be used to show the location of the international boundary line, as the man who has identified this map admits that it was made by another branch of the government. He has not shown that he has any knowledge of the making of this map, or as to whether the objects located on this map are true."

■ The witness who identified the map was an officer of the United States Army, and the map was concededly made by a division of the War Department. But, even if this had not been so, the objection as made was without merit. We are not called upon to decide whether or not there is sufficient evidentiary force in the inference that the lighthouse service annually places the buoy on the boundary, because the War Department has to everyone's knowledge informed mariners and public officials that the buoy marks the boundary line. Defendant made no objection on the ground of relevancy. It is also unnecessary to decide whether the chart would have been admissible as direct evidence of the location of the boundary line, on the ground that it was an official statement, and so not subject to the hearsay prohibition.

■ The survey by Lewis is objected to on the ground that his only knowledge as to the location of the boundary line came from a book furnished him by the United States Engineer, and purporting to be issued by the International Boundary Line Commission although without any certification to that effect by the Secretary of State. The objection is such a purely technical one that, even if well taken, its denial does not constitute a miscarriage of justice. Lewis, a surveyor, properly found the boundary line by triangulating from monuments placed for the purpose by the Canadian government and by consulting a book which, although uncertified, had been furnished from official sources for the precise use to which he put it. Thomas, with his 47 years' experience in those very waters, was competent to state the location of the boundary line, even though he had never seen certified copies of treaties.

■ Error is also assigned with respect to

certain questions permitted to be asked defendant's witness Gleason, designed to show that, if the dredging was in Canadian waters, as contended by the defense, it would have been in violation of the Canadian law. The objection is based upon the rule against proof of other crimes, not the rule against self-incrimination. But the purpose of these questions was not to show that, because defendant had committed other crimes, it had probably committed the present one; in fact, it was quite the contrary. In any event, and irrespective of the further justifications that the subject had been introduced by defendant, and that the questions were designed to bring out contradictions in Gleason's testimony, there was clearly no prejudice to defendant requiring a reversal.

Judgment affirmed.