UNITED STATES of America, Plaintiff,

v.

Leonard M. WEISMAN, an Individual and Hilger & Ray Engineer Assoc., Inc., a Florida Corporation, Defendants.

No. 79–137–Civ–Oc.

United States District Court,
M. D. Florida,
Ocala Division.

May 15, 1980.

Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for the United States of America.

Barry S. Sinoff, Jacksonville, Fla., William J. Roberts, Tallahassee, Fla., for Weisman.

Dock A. Blanchard, Ocala, Fla., for Hilger & Ray.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

In 1979, the defendant property owner, Leonard M. Weisman, constructed a dirt fill roadway on recently purchased property located adjacent to Kings Bay on the Crystal River in Florida. The new roadway led from a state road on the western boundary through a lowland forest, crossing several small creeks, to Weisman's new homesite, a beautiful, secluded point of land at the eastern extreme of the property overlooking the river. The United States Army Corps of Engineers (the Corps) opposed this project and had issued no permit for construction.

The plaintiff, United States of America, brought this action for civil penalties and injunctive relief, alleging that the defend-

ants' filling and construction activities have and will: (1) alter and modify the course, location, condition, and capacity of the navigable waters of the United States in violation of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and (2) result in the discharge of fill material into waters of the United States in violation of Sections 301(a) and 404 of the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1311(a) and 1344 (FWPCA). The plaintiff asks the Court to impose civil penalties and to order that the property in question be restored to its original condition before the commencement of defendants' filling and construction activities. This action was commenced on December 20, 1979, with a motion for temporary restraining order, supported by affidavits, and a civil complaint accompanied by an application for preliminary injunction. The Court granted the temporary restraining order. On February 20, 1980, the plaintiff moved the Court to enter a contempt decree against defendant Weisman for violation of the temporary restraining order. After a two-day hearing at the end of February 1980, the Court issued its opinion and order denying the government's motion for contempt and granting the preliminary injunction.[1] The evidence received with regard to the preliminary injunction was made a part of the record at the trial on the merits on March 31, 1980, pursuant to Rule 65(a)(2), Fed.R.Civ.P. Based upon the findings and conclusions set forth below, the Court holds that the defendants violated both Section 10 of the Rivers and Harbors Act and Sections 301(a) and 404 of the FWPCA.

Defendant Weisman is the owner[2] of a rectangular tract of land situated in Section 29, Township 18 South, Range 17 East, Citrus County, Florida, bounded on the west by State Road 44 and on the east by the Crystal River (App. A). The north and south boundaries form the long sides of this

---

1. *United States v. Weisman*, No. 79–137–Civ–Oc (M.D.Fla. March 14, 1980) (order granting preliminary injunction).

2. Defendant Weisman either owns or controls all of the property. All parties have stipulated that for purposes of this litigation he is to be

treated as sole owner (*see* Feb. TR at 197–202). Similarly, all parties have stipulated that defendant Hilger & Ray Engineer Associates, Inc. acted at all times pertinent to this action as the agent of defendant Weisman (*see* Feb. TR at 9–10).

relatively narrow rectangle. Approximately 375 feet wide and over 2300 feet long, the tract consists of roughly 20 acres. Defendant Weisman purchased the property early in 1979. Prior to the filling and construction activities which are the subject of this action, the property consisted of about 5.5 acres of relatively high ground or upland and approximately 14.5 acres of relatively low, forested terrain. This terrain is part of a larger even-aged, flat-top, floodplain wetland forest system which extends for some distance south of the Weisman property, bounded on the west by State Road 44 and on the east by the Crystal River. A meandering tidal creek flows into and across the Weisman property from a point on the Crystal River south of the Weisman homesite, west and north until its path is lost among tiny, spring-fed tributaries. During dry periods and low tides, water may flow from northeast to southwest. High tide causes the water to back up, reversing the flow and regularly flooding the lowest portion of the Weisman property to an elevation of about 1.5 feet above mean sea level. During periods of exceptionally high water, the creek overflows its bed and floods the entire adjacent lowland area.[3] The Crystal River is a navigable-in-fact body of water at Kings Bay and enters the Gulf of Mexico just five miles downstream.

As noted above, the property is not all lowland. The homesite at the eastern extreme is located on upland terrain. In the western portion of the property, a narrow "ridge" of relatively high ground (more than two feet above sea level) runs north-south about 400 feet east of and parallel to State Road 44. Also, the northern boundary of the property parallels a pre-existing, unsurfaced, fill roadway which, of course, is high ground.

This old roadway, as it is referred to in this opinion, was constructed some time before defendant Weisman purchased the property. It runs from State Road 44 on the west for a distance of some 1900 feet to the upland homesite on the eastern end of the Weisman property. It was created by the placement of dredged spoil material from a borrow ditch or canal located immediately north of and parallel to the old roadway. Though narrow and overgrown in its present condition, the old roadway provides single-lane access to the upland homesite and was, in fact, used for this purpose from time to time by cement trucks and other vehicles during the construction of defendant Weisman's new home. The old roadway and canal physically separate the Weisman property from the neighboring property to the north, which is being developed for single-family homesites. There are no culverts under the old roadway so that its raised bulk of fill material also acts as a dike. The northern boundary of the property is just north of the canal so that both canal and roadway are a part of the Weisman property.

Some time in 1979, defendant Weisman decided to build a new roadway near the southern boundary of the property, from State Road 44 to his homesite. He hired defendant Hilger & Ray Engineer Associates, Inc. (Hilger & Ray) to design the new roadway and to obtain all the necessary permits. In May 1979 defendant Weisman, through Hilger & Ray, submitted a joint permit application to the Jacksonville District of the Corps and the Florida Department of Environmental Regulation,[4] seek-

---

**3.** The nature and extent of the inundation or saturation of the property is important to both the questions of liability and remedy and is subsequently discussed in this opinion. In general, the Court finds that significant portions of the Weisman property are periodically saturated by tidal action.

**4.** The joint application is an innovation by state and federal regulators intended to avoid the duplication of effort in parallel permitting procedures, the overlapping of notice require-

ments, and the delay in the processing of applications. Although the application may have been submitted on a single form, it appears that defendant Weisman was required to deal separately with the two agencies throughout the entire process. Though this matter is purely collateral to the issues of this case, it should be noted in fairness to defendant Weisman that the conflicting information which he received from state authorities contributed to his frustration with the permitting process (see Feb. TR at 281–86).

ing permission to construct a roadway 18 feet wide and 1700 feet long, with an average depth of three feet, through the lowland portion of the Weisman property (PX–1).[5] The proposed new roadway began at State Road 44 and ended just a short distance from the termination of the old roadway at the upland homesite; however, the drawings of the project which Hilger & Ray submitted did not depict the old roadway.[6] The Corps published a notice of this project on June 1, 1979, requesting comment (PX–2).

On June 21, 1979, Richard Clutter, a biological technician for the Corps, inspected the area of the proposed project. His inspection led him to recommend that the proposed roadway not be permitted because of the availability of the old roadway leading to the same location and because of the biological harm that would result from the construction of the new roadway. On July 23, 1979, Joseph Bacheler, Clutter's supervisor and a biologist, discussed the proposed project with both defendants and suggested that the proposed road not be constructed for the same two reasons. Subsequently, defendant Weisman, through James P. Eyster, his real estate broker, wrote to the Jacksonville office of the Corps explaining that the new roadway was needed to provide "the privacy and natural look" which the defendant desired. The letter went on to state that defendant Weisman was willing to "put in as many additional culverts that are needed or necessary to effectively provide for any water flowage." (DX–D). On August 20, 1979, Hilger & Ray submitted a revised project design. The revision included new sketches which showed that the proposed roadway fill would cross the meandering tidal creek and the mean high water line[7] in several places. (PX–

15). The revised sketch still did not depict the old roadway, however.

The defendants' first written notification that a permit would not be issued came on October 17, 1979, in a letter from the Corps to Hilger & Ray and Weisman. The letter clearly indicated that the Corps' Tampa Area office had recommended that the permit not be issued and that the old roadway be modified and used instead. The letter continued:

> If you disagree with their recommendations, it is requested that you specifically demonstrate the following:
>
> (a) That the proposed activity is water-dependent and no alternate sites are practical.
>
> (b) That the proposed project will not cause permanent unacceptable disruption of the aquatic ecosystem.
>
> It will be very difficult for us to approve your proposed project over the objections of the above offices. We request that you advise us of your decision by November 30, 1979. If we do not receive a response by the above date, then we will assume that you have no further interest in obtaining a Department of the Army permit application, we will deactivate your file, and this letter will constitute final action by the Department of the Army.

(PX–16). Warren E. Hilger, P.E., responded to the Corps' letter on November 29, 1979. He indicated that the new road was desired because it would afford the owners greater seclusion from the residential property to the north than would the old roadway. He disagreed with the proposition that permanent disruption of the aquatic ecosystem would result from the installation of the new roadway:

---

**5.** The following abbreviations, followed by an appropriate number, letter, or page reference, are used throughout this opinion referring to portions of the record:

   PX      – Plaintiff's Exhibit.
   DX      – Defendants' Exhibit.
   Feb. TR – Transcript of Testimony and Proceedings, Feb. 26–27, 1980.
   Mar. TR – Transcript of Testimony and Proceedings, Mar. 31, 1980.

**6.** The new roadway and the pre-existing old roadway are never more than 300 feet apart, and at two points they are separated by less than 100 feet. In fact, the new roadway is visible from the old roadway in winter.

**7.** "Mean high water" has been defined to be the average height of all high waters over a given location during a span of 18.6 years. *United States v. Ray*, 423 F.2d 16, 20 at n. 7 (5th Cir. 1970).

The facts of the matter are that throughout most of the year, the area is entirely dry and there are no flowing streams on the property. In those areas which are during the high tide periods of the Equonox [sic], subject to inundation by unusually high tides, it is our intention on each place on the prospective roadway, to place culverts to allow water to flow in the same degree as previously existed so that, in fact, we will be making no changes to the environment whatsoever. The only issue involved here is the choice of a site for a road on private property.

(See plaintiff's motion for temporary restraining order, Calvarese affidavit, Exh. E). To date, the Corps has issued no permit for the construction of the new roadway.

Defendant Weisman, through a contractor, began construction of the new roadway on December 10, 1979. Work continued undetected by the Corps until December 14, 1979. On that day, Richard Clutter, the biological technician who previously inspected the Weisman property, observed trucks dumping fill and bulldozers spreading that fill into the wetlands located east of State Road 44 in the area shown on defendant Weisman's permit application and public notice as being the location of the proposed new roadway. By December 14th, approximately three-fourths of the roadway had been completed. Mr. Clutter's photographs of the site taken on this occasion were admitted into evidence (PX–7). That evening, Mr. Bacheler, Clutter's supervisor, telephoned defendant Weisman and asked him why the work was proceeding without a permit. Defendant Weisman explained that he had a "permit" because the Corps had failed to act upon his application within 90 days. When Mr. Bacheler asked him if he would stop work voluntarily, defendant Weisman said he intended to complete the project. On December 17, 1979, Mr. Clutter returned to the site and observed and photographed continued filling and leveling work (PX–8). In keeping with defendants' stated intention, the new roadway at the present stage of construction

contains seven culverts or combinations of culverts, allegedly positioned to accommodate normal water flow on the property (PX–18). Defendant Weisman testified that the new roadway was constructed with his full knowledge and approval and that he accepted full responsibility for it. In fact, when Mr. Calvarese, of the Corps' legal staff, telephoned defendant Weisman on December 18, 1979, defendant Weisman told him that he wanted the Corps to take the matter to court. At least with regard to this request, the Corps gave defendant Weisman prompt action. As previously noted, the Court granted plaintiff's request for a temporary restraining order on December 20, 1979.

### The Federal Water Pollution Control Act Claim

The first issue before the Court is whether the defendants' construction of the new roadway required a permit under the Federal Water Pollution Control Act (FWPCA). The objective of the FWPCA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's water." Section 101(a), FWPCA, 33 U.S.C. § 1251(a). The Act attacks two different categories of pollution, subjecting them to different programs of regulation: that which emanates from point sources and that which is derived from other sources, termed "non-point sources." Point sources of pollution, except those exempted under Section 404(f)(1), are regulated by permit programs under Sections 402 and 404 of the FWPCA. Other sources of pollution are regulated under the Section 208 Best Management Practice Program and do not require a permit. Thus, defendant Weisman's activities would have to constitute point source pollution in order to require a permit under the FWPCA.

■ Section 301(a) of the FWPCA, 33 U.S.C. § 1311(a), is the main axis of the FWPCA's attack on point sources of pollution.[8] That section makes it unlawful to discharge any pollutant into the waters of

---

8. 33 U.S.C. § 1311(a) reads:

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

the United States unless a permit is granted under Sections 402 or 404. Section 502(14) of the FWPCA defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any . . . discrete fissure, container, rolling stock . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). It is clear from this definition that defendant Weisman's bulldozers and dump trucks were point sources within the meaning of the FWPCA. *United States v. Holland*, 373 F.Supp. 665, 668 (M.D.Fla. 1974). The next question is whether the material which they dumped and spread on defendant Weisman's property constituted a "pollutant" under the FWPCA and "fill material" under the applicable permit program.

■ Section 502(6) of the FWPCA defines "pollutant" as "dredged spoil, solid waste, . . . biological materials, . . rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Even though the defendants' fill material would constitute a pollutant under the Act, the defendants' activities could nevertheless be exempted from the FWPCA prohibition if done in compliance with the applicable permit program. Section 404 of the FWPCA, 33 U.S.C. § 1344, regulates the discharge of dredged or fill material and is administered by the Corps of Engineers. The term "fill material" is not defined in the FWPCA but is defined in the Corps' regulations implementing the Section 404 permitting program:

> (m) the term "fill material" means any material used for the primary purpose of replacing an aquatic area with dry land by changing the bottom elevation of a water body.
>
> (n) the term "discharge of fill material" means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: *placement of fill* that is necessary to the construction of any structure in a water of the United States; the building of any structure or impoundment requiring rock, sand, dirt, or other material for its construction;

site development fills for recreational, industrial, commercial, *residential*, and other uses; *causeways or road fills*; dams and dikes; artificial islands; property protection and/or reclamation devices such as rip-rap, groins, seawalls, breakwaters, and revetments; beach nourishment; levies; fill for structure such as sewage treatment plants, intake and outfall pipes associated with power plants and subaqueous utility lines; and artificial reefs. The term does not include plowing, cultivating, seeding and harvesting for the production of food, fiber, and forest products.

33 C.F.R. § 323.2(m) and (n) (emphasis added). As previously stated, defendants' construction activities involve substantial discharges of fill material which meet the definition set forth in the above regulations.

■ Finally, the Court must address the question of whether the defendant discharged these materials in "waters of the United States." The term "waters of the United States" is defined in 33 C.F.R. § 323.2(a) in pertinent part as:

> (2) coastal and inland waters, lakes, rivers, and streams that are navigable waters of the United States, including adjacent wetlands; [and]
>
> (3) tributaries to navigable waters of the United States, including adjacent wetlands.

33 C.F.R. § 323.2(a)(2) and (3). The regulation further defines the term "adjacent" to mean "bordering, continuous, or neighboring" but goes on to state that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes or the like are 'adjacent wetlands.'" 33 C.F.R. § 323.2(d). These definitions are in keeping with the purpose of the FWPCA as revealed in its legislative history. Congress fully intended that the waters subject to regulatory control of the United States under the FWPCA be given the "broadest possible constitutional interpretation." H.R.Rep.No.92–1465, 92nd Cong., 2nd Sess. at 144 (1972), U.S. Code Cong. & Admin.News 1972, p. 3668; 1972 Cong.Rec. at S16876 (daily ed. Oct. 4,

1972) (report of Senator Muskie to the Senate); *National Resources Defense Counsel, Inc. v. Callaway,* 392 F.Supp. 685, 686 (D.D. C.1975). The scope is not limited to the traditional tests of navigability, but rather is defined in Section 502, FWPCA, 33 U.S.C. § 1362(7), which defines "navigable waters" under the FWPCA as "waters of the United States, including the territorial seas." *See Conservation Council of North Carolina v. Costanzo,* 398 F.Supp. 653, 673 (E.D.N.C. 1975). This definition effectively excludes from consideration any concept of navigability in law or in fact. *See United States v. GAF Corporation,* 389 F.Supp. 1379, 1383 (S.D.Tex.1975); *United States v. Holland,* 373 F.Supp. 665, 673 (M.D.Fla.1974). It is therefore clear that Congress intended to protect the waters of the United States in a plenary, geographic sense, and that wetlands are specifically included within that protection. *See Conservation Council of North Carolina v. Costanzo, supra; United States v. Holland, supra.*

The Corps regulations define wetlands as: [T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, bogs, and similar areas.

33 C.F.R. § 323.2(c). Defendants now concede that a large portion of the Weisman property constitutes "wetlands" within the meaning of the definition. Both sides agree that the easternmost 75 feet of the new roadway is situated on upland terrain

not within the definition and, thus, not within the jurisdiction of the Corps. However, defendants contend that the western 400 feet of the new roadway is, likewise, outside the Corps jurisdiction. Despite the fact that defendants' expert Dr. Donald Richardson testified that this area contained a "well-developed wetland system," the defendants claim that the topographical survey indicates the area is non-tidal. According to the defendants, the previously noted north-south "ridge" of relatively high ground, running parallel to State Road 44 about 400 feet to the east, prevents the area between it and State Road 44 from being influenced by the tide. The defendants conclude that in the absence of tidal influence, this portion of the new roadway is either exempt from Corps jurisdiction or else permitted under the "nationwide permit" or "general permit" provisions [9] of the regulation.

■ A discussion of the defendants' legal conclusion is unnecessary because the evidence does not support their factual assertions. The testimony of Dr. Richardson has been previously mentioned (Mar. TR at 87). That testimony verified previous testimony by plaintiff's expert biologist Mr. Robert Lazor. He testified that although there was a teardrop-shaped "island" of relatively high ground approximately 100 feet wide and 125 feet long, the toe of which "extended out almost across the existing roadway," the intervening area was wetland (Feb. TR at 115–16; PX–3A). Mr. Skiles, the defendants' expert in hydrology, testified that the area appeared to be non-tidal because,

---

**9.** The term "general permit" means a Department of the Army authorization that is issued for a category or categories of discharges of dredged or fill material that are substantially similar in nature and that cause only minimal individual and cumulative adverse environmental impact. A general permit is issued following an evaluation of the proposed category of discharges in accordance with the procedures of this regulation (§ 323.3(c)), 33 C.F.R. Part 325, and a determination that the proposed discharges will be in the public interest pursuant to 33 C.F.R. Part 320.

33 C.F.R. § 323.3(p).

The term "nationwide permit" means a Department of the Army authorization that has

been issued by this regulation in § 323.4 to permit certain discharges of dredged or fill material into waters of the United States throughout the nation.

33 C.F.R. § 323.3(g).

Defendant Weisman cited 33 C.F.R. § 323.4–3(a)(3), which concerns the nationwide permit for minor road crossing fills, as the ground for the second affirmative defense in his answer to the complaint. Otherwise, these issues were not argued during any of the proceedings in this case by either side, nor does it appear that any evidence was presented which would support their applicability.

on the day that he visited the property, he saw no evidence of any water flowing through the culvert located in this area under the new roadway. He also expressed doubt, based on his observations, that tidal water from Kings Bay could reach the average high tide level on this part of the property (Mar. TR at 125–26). On the other hand, the plaintiff's expert hydrologist Mr. Hansen testified that although he observed no water flow through the culvert in the first 400 feet of the new roadway, he did see ponded water on one side of the roadway (Mar. TR at 50). He further testified that peak tides as high as three feet registered at the Crystal River Gauging Station translate into peak high tides from 2.5 to 2.8 feet on the Weisman property (Mar. TR at 28). The highest spot elevation on the defendants' topographical survey in the vicinity of the so-called ridge is 2.1 feet (PX–18). In short, the evidence on which the defendants rest their factual conclusions is too speculative. Mr. Lazor's overlay (PX–3A) correctly represents the location of wetlands on the property. The preponderance of the evidence indicates that, except for the upland "island," the western 400 feet of the Weisman property, including that portion now covered by the new roadway, was periodically saturated by the tidal action of the Crystal River and its tributaries. The Court finds that, with the exception of the eastern 75 feet of the roadway and with the exception of a small area of the roadway where the "ridge" or "island" touches it, all of the new roadway is built on wetlands within the reach of the FWPCA (Feb. TR at 115–16; PX–3A).

The lowland portion of the Weisman property is correctly described as an even-aged, flat-top, flood-plain wetland forest. This description was based upon an intensive, two-day inspection by Mr. Lazor, who is familiar with the definition of wetlands. He testified, based on personal vegetation surveys, that wetland vegetation was located in abundance on the lowland portion of the property (Feb. TR at 105–112). His survey involved nine transects in which he identified trees, shrubs, and herbaceous species at 20-foot intervals and computed the statistical frequency of each specie based upon this sample (Feb. TR at 110; PX–3A and PX–12). His investigation resulted in the identification of 23 herbaceous species of ground cover herbs and vines, five shrub species, and 10 species of wetland trees (PX–13). A subsequent investigation by defendants' Dr. Richardson verified the conclusion that the prevalent vegetation consists of wetland species (DX–I). The wetland description is further supported by the personal observations of all of the plaintiff's experts who inspected the property. Each testified to the presence of water of varying depths, the ponding of water in areas near the new roadway, and tidal influence from the flow of water through most of the culverts under the new roadway. Finally, both the Hilger & Ray mean high water analysis (PX–15) and the topographical survey conducted by defendants' hydrological expert, Mr. Skiles, (PX–18) indicate that the new roadway crosses the mean high water line and the meandering tidal creek in several places.

The Court has no hesitancy in holding that the lowland area through which the new roadway passes is indeed wetland and falls within the jurisdiction of the Corps and this Court. The discharge of fill material on this wetland without a permit was in violation of Sections 301(a) and 404 of the FWPCA.

### The Claim Under Section 10 of the Rivers and Harbors Act of 1899

Unlike the FWPCA, the jurisdiction of the Corps under Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, is still linked to the definition of navigable waters. As a statement of regulatory scope and authority, however, it is simple and straight-forward in comparison with the statutory maze of the FWPCA. In pertinent part, Section 10 makes it unlawful to "excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of any port, haven, harbor, canal, lake, harbor of refuge, . . . or of the channel of any navigable water of the United States," without the permission of the Corps. The Code of Federal Regulations defines the term "navigable waters of the United States" as

Those waters that are subject to the ebb and flow of the tide shoreward to the mean high water mark . . . and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce.

33 C.F.R. § 322.2(a). Elsewhere the Code explains that "a determination of navigability, once made, applies laterally over the entire surface of the water body, and is not extinguished by later actions or events which impede or destroy navigable capacity." 33 C.F.R. § 329.4.

■ Defendant Weisman concedes that the Crystal River is a navigable water of the United States. Waters which are navigable in fact are navigable in law as well. *United States v. Underwood*, 344 F.Supp. 486, 496 (M.D.Fla.1972). As stated in the definition above, the legal status of a determination of navigability applies laterally over the entire surface of the water body and extends shoreward to the mean high water mark.[10] Thus, the tidal creeks connected to the Crystal River which traverse the Weisman property are navigable waters. *See, e. g., United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976) (canals physically connected to Blackwater Sound). As previously noted above, both the Hilger & Ray mean high water analysis (PX–15) and the defendants' topographical survey (PX–18) indicate that the new roadway fill crosses these tidal creeks and is located below the mean high water line in several places.

■ The defendants argue that these creeks are not, have not been, and never will be navigable. Further, they contend that even if the creeks are navigable, the plaintiff has failed to show that the defendants' activities modified their course, location, condition, or capacity. Neither of these arguments can withstand scrutiny.

No inquiry is required here concerning the potential of these tidal creeks for commerce or transportation. *United States v. Cannon*, 363 F.Supp. 1045, 1050 (D.Del.1973). *See also, United States v. Lewis*, 355 F.Supp. 1132 (S.D.Ga.1973). With regard to the contention that the plaintiff has failed to show alteration or modification of these waters, the defendants' interpretation of Section 10 imposes the burden of an element of proof which the plaintiff is not required to bear under the law. The language "to alter or modify" has long been construed to refer only to acts other than excavation or filling. *F. D. Gleason Coal Company v. United States*, 30 F.2d 22, 23 (6th Cir. 1929). Any excavation or filling operation necessarily alters or modifies the body of water which is its subject. *United States v. Benton and Company, Inc.*, 345 F.Supp. 1101, 1102 (M.D.Fla.1972). Neither the law nor the circumstances of the instant case require that the government prove alteration or modification as a separate element of the alleged violation. The placing of fill in the tidal creeks and below the mean high water line without a permit constitutes a violation of Section 10 of the Rivers and Harbors Act of 1899.

### Defendant Weisman's Case, Equitable and Otherwise

Although defendant Weisman essentially concedes the issue of Corps jurisdiction, at least with respect to the FWPCA, he urges the Court to take into consideration the manner in which the Corps handled his application and the difficulty which a layman encounters in attempting to understand and comply with the regulatory procedures. These arguments appear to be in the nature of estoppel.[11] Defendant Weisman explains that he acted in reliance upon official regulations and publications sent to him at his request by the Corps.[12] He contends these

10. The Fifth Circuit has held that even activities which occur above the mean high water line of navigable waters may come within the prohibition of Section 10 under certain circumstances. *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1298–99 (5th Cir. 1976).

11. As his third affirmative defense, defendant Weisman also alleged that the "methods of the

Corps" were arbitrary and capricious and in violation of the Fifth Amendment. The defense was not argued in any of the proceedings, nor does it appear supportable on the facts in evidence.

12. The publications cited by defendant Weisman are the Federal Register, Vol. 42, No. 138 (Tuesday, July 19, 1977) (Part II) and a pamph-

documents led him to believe that by failing to grant or deny his application within 90 days, the Corps lost its authority to deny him a permit. He further argues that the Corps received and considered the only adverse comment on his proposed project from the United States Environmental Protection Agency after the close of the public notice comment period (see EPA letter, dated August 13, 1979, attached to PX–16). Finally, he argues that the regulatory definition of wetlands is not susceptible of any reasonable lay interpretation in the absence of an official guide or listing of wetland species.

■■■■ With regard to the first two contentions above, it is true that federal agencies are bound by their own regulations. *Kirkland Masonry Inc. v. CIR*, 614 F.2d 532, 534 (5th Cir. 1980). It is readily apparent, however, that the regulations to which the defendant refers, the regulations concerning the timing of processing of applications, are advisory rather than mandatory. The introductory paragraph recognizes that some applications will take longer than others and that the "applicants must allow adequate time for the processing of their applications." 42 Fed.Reg. 37,122 at 37,151 (1977). The time required is clearly within the discretion of the District Engineer. It is also within his or her discretion to request comments from another agency "[i]f a question develops with respect to an activity for which another agency has responsibility and that other agency has not responded to the public notice." *Id.* No abuse of discretion is indicated on this record.

Defendant Weisman's similar argument with regard to the publication entitled "State of Florida Joint Permit Application" (DX–A), a pamphlet intended to assist the public in applying for dredge and fill permits, is entirely without merit and borders on the frivolous. Even if the Court agreed that any of these administrative documents could reasonably be construed to impose a

90-day deadline on the disposition of applications, it is doubtful that defendant Weisman would be entitled to invoke the deadline because, in the first instance, he failed to include any reference to the existence of the old roadway in his original application and later failed to provide the additional information sought by the Corps concerning alternatives to the project (see PX–1 and PX–16). Although the Court has no reason to determine this question here, these omissions could well be construed to invalidate the defendant's application under the Corps' regulations. See 42 Fed.Reg. *supra* at 37,-149 (§ 325.1(c) and (d)).

The Court has previously rejected defendant Weisman's contentions concerning the regulatory definition of wetlands.[13] The definition contains sufficient guidance for implementation even in the absence of a published list of wetland species. The defendants offer no evidence of any significant difference of opinion among botanists concerning which species of herbs, shrubs, and trees are "typically adapted for life in saturated soil conditions." The Court agrees that a layman untrained in botany might have difficulty in determining whether his property constituted wetland under the regulatory definition, especially if the property were located on transitional terrain where both wetland and upland species might be found. But defendant Weisman had the benefit of the opinions of Corps experts on this matter before he commenced construction. Rather than take the opportunity provided him to dispute their evaluation, he indulged in conduct which the Fifth Circuit has termed "Self Help for the Impatient." *United States v. Joseph G. Moretti, Inc.*, 478 F.2d 418, 427 (5th Cir. 1973). Having invited the Corps to issue him a permit and having been refused, he then commenced construction and invited the Corps to take him to court. The Corps accepted his second invitation.

---

let entitled "State of Florida Joint Permit Application for Dredge Fill Structures," published September 1, 1977, as a combined project of the Florida Department of Environmental Regulations, Florida Department of Natural Resources, and the Corps (DX–C and DX–A).

**13.** Opinion of March 14, 1980, *United States v. Weisman*, No. 79–137–Civ–Oc (M.D.Fla., filed December 20, 1979).

There is generally no basis for estoppel where a property owner proceeds with dredging or filling operations without permission. *Weiszmann v. Dist. Eng., U. S. Army Corps of Eng.*, 526 F.2d 1302, 1305 (5th Cir. 1976). This is not a case like *United States v. Lewis*, 355 F.Supp. 1132 (S.D.Ga.1972) in which the property owner proceeded with construction of a causeway across tidal marshland because he understood that he had verbal approval from a Corps officer. Nor is it a case in which the Corps stood by and watched until the defendant had completed the project before voicing its objections. *Id.* at 1141. Neither do the instant facts resemble *Avoyelles Sportsmen's League v. Alexander*, 473 F.Supp. 525 (W.D.La.1979), where a preliminary determination by the Corps that some of the property was not wetland was changed after the defendants had already cleared the area in preparation for development. In the instant case, defendant Weisman was informed in the clearest terms that the Corps would not issue a permit and that if he wished to pursue the proposed project, he had the burden of *demonstrating* that there was no practical alternative site and that the project would not cause "permanent unacceptable disruption of the aquatic ecosystem." He did neither, and by commencing his project across wetlands he plunged himself into a morass of a different sort from which the principles of equity offer no escape.

## The Restoration Remedy

In addition to civil penalties, the plaintiff asks the Court to order restoration of the property to its original condition. The restoration plan calls for the removal of all unauthorized fill and associated structures down to the former wetland and tidal creek elevations, appropriate disposal of the fill, and the replanting of the restored area with wetland species.[14] Defendants oppose the plan and offer an alternative which they contend will satisfy all reasonable and practical environmental goals while allowing the new roadway to stay in place.

Primary guidance for the imposition of the restoration remedy is contained in *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293, 1301 (5th Cir. 1976). In this case, a developer excavated ten canals on property adjacent to navigable waters of the United States. Five of the canals were actually connected to the navigable waterway, while the other five were landlocked. The district court ordered restoration of all ten canals. The Fifth Circuit reversed the district court order as to the landlocked canals, which were held to be outside the Corps' jurisdiction. The order pertaining to the restoration of the other five canals was vacated and remanded. With regard to the remanded portion, the Court of Appeals explained:

> The full effects of any environmental disturbance are difficult to measure. Attempts to reverse such effects and restore the environment to its natural state carry with them no guarantee of success. Hence, any restoration plan must be carefully designed to confer maximum environmental benefits. At the same time, the law must be tempered with a touch of equity. [citation omitted] The degree and kind of wrong and the practicality of the remedy must be considered in the formulation of that remedy.
>
> \* \* \* \* \* \*
>
> Under these circumstances, and because of the uncertainty implicit in environmental rehabilitation, the parties should be afforded a hearing to fully develop the situation.

526 F.2d at 1301.[15] As the Court understands it, *United States v. Sexton Cove Estates, Inc.* teaches that there are two prerequisites to be satisfied before any consideration of the restoration plan itself: (1)

---

14. The plan calls for replanting the area with species of red maple, ash, hickory, water oak, sweet bay, or red bay trees, one every meter on centers throughout.

15. The Fifth Circuit underlined the necessity of an adequate factual record supporting the restoration order in *Weiszmann v. Dist. Eng., U. S. Army Corps of Eng.*, 526 F.2d 1302, 1304 (5th Cir. 1976). The record should establish "that the court's choice of the specific restoration ordered was based upon a comprehensive evaluation of the environmental factors involved and the practicalities of the situation." *Id.*

the court must have jurisdiction over the portion of the property or activity to be directly affected by the restoration plan, and (2) the court must conduct a hearing in which the merits, demerits, and alternatives to the restoration plan are fully developed. Once these preliminaries have been satisfied, the court may consider what restoration, if any, may be appropriate. The selected plan must: (1) confer maximum environmental benefits, (2) be achievable as a practical matter, and (3) bear an equitable relationship to the degree and kind of wrong which it is intended to remedy.

The first two prerequisites are fully satisfied in the instant case. The Court has found that it has jurisdiction over the entire roadway except for the last 75 feet at the eastern end and the small area where the upland "island" identified by Mr. Lazor touches the roadway. With these exceptions, the entire roadway is constructed on wetlands within the jurisdiction of the Corps and this Court. Further, the hearing on the merits of this case was devoted almost entirely to expert testimony bearing upon the question of restoration. Both sides have had ample opportunity to explore this issue. For reasons set forth more fully below, the Court concludes that the plaintiff's proposed restoration is an appropriate and necessary remedy in this case.

### Maximum Environmental Benefit

In order to gauge the benefit to be derived from any further alteration of the environment on the Weisman property, it is necessary to reach some conclusions concerning its present condition. The extent of the environmental alteration which has and will result from the construction of the new roadway is a matter of dispute. First of all, the plaintiff contends, upon expert testimony, that the roadway itself covers approximately 2.2 acres of heretofore wetland forest, which was cut and covered by the fill. The defendants challenge this assertion as a matter of law, claiming that only 2.042 acres have been lost because the first 400 feet of the roadway is located on

terrain which is not within the Corps jurisdiction. This contention and its factual basis have been previously rejected in the Court's jurisdictional findings, based upon vegetation surveys and observations of experts. The figure of 2.2 acres does not include either the last 75 feet of the new roadway or the area where the upland "island" touches the roadway.

Secondly, the plaintiff contends that the new roadway fill, despite the existence of seven culverts or pairs of culverts, restricts the flow of water across the Weisman property and alters the natural pattern of water flow both on the property north of the roadway and on the adjacent wetlands to the south. Mr. Howard Hansen, a civil engineer with the flood-plain management branch of the Corps, testified on the hydrological effects of the roadway. Based upon the defendants' topographical survey, on-site investigation, and mathematical calculations, he concluded that at the mean peak high tide of 1.5 feet above mean sea level the new roadway reduces the normal water surface elevation north of the roadway by approximately six inches (Mar. TR at 14–19). This decrease is caused by the reduction in tidal water flow from south to north, essentially a reduction of water energy as it is forced to move through the culverts under the roadway. Conversely, the roadway also restricts flow in the opposite direction when the tidal cycle is reversed and waters begin to recede. The combined result of the impervious fill and the culverts underneath it is to reduce channel flow and sheet flow [16] north of the new roadway (Mar. TR at 18–19, 23–24).

Mr. Hansen graphically depicted the effects of a six-inch reduction in the water surface elevation on sheet flow north of the new roadway by outlining on the topographical survey both the land area that formerly would have been inundated and the area that would presently be covered by sheet flow at the mean peak high tide of 1.5 feet above mean sea level (Mar. TR at

16. "Sheet flow" refers to a thin overland flow of water that occurs when the water elevation exceeds the elevation of the banks of a channel

and the surrounding terrain. Mr. Lazor described the flow as "very thin, almost capillary" (Feb. TR at 121).

25–27; PX–18). With regard to sheet flow at mean peak high tide across the wetland area now covered by the new roadway, the restriction posed by the fill and culverts would not be great because most of the sheet flow would occur on the low terrain immediately adjoining the tidal creek beds in the vicinity of the existing culverts (Mar. TR at 24). However, Mr. Hansen further emphasized that, while he based his calculations on the average figure of 1.5 feet above mean sea level, 50% of the high tides on the Weisman property would equal or exceed 1.5 feet above mean sea level up to a highest peak high tide of approximately 2.5 to 2.8 feet above mean sea level (Mar. TR at 28, 53). A high tide of 2.3 feet would cover all of the wetland portion of the Weisman property (Mar. TR at 35–36). The higher the tide, the more significant would be the reduction in channel and sheet flow both on the terrain covered by the new roadway and on the terrain north of the roadway. The reduction in the area of property affected by sheet flow from these higher-than-average tides would be proportionately greater than the reduction calculated for the mean peak high tide of 1.5 feet (Mar. TR at 35–36).

The defendants dispute the conclusion that the roadway fill restricts channel and sheet flow. Their hydrology expert Mr. Carl Skiles testified that, with one exception,[17] the present culverts imbedded in the new roadway are adequate to provide for average channel flow in the tidal creeks (Mar. TR at 127). With regard to sheet flow, Mr. Skiles testified, based upon the topographic survey which he conducted on the property, that natural ground elevations immediately north and south of the new roadway, other than those taken in the tidal creeks themselves, are at or about 1.5

feet mean sea level. From this he concluded that at the mean peak high tide of 1.5 feet no sheet flow would ever proceed north of the area now covered by the new roadway, even if the fill were removed (Mar. TR at 126, 137–40).

Mr. Skiles agreed that during higher than average high tides[18] sheet flow might reach the new roadway and be restricted to a small degree in its flow northward. This sheet flow, however, would only occur near the locations where the roadway crosses the tidal creeks. Therefore, he concluded that with some modification of existing culverts and the addition of five culverts in critical areas, the water would readily flow through the culverts and spread out on the lowest terrain north of the roadway without a significant reduction in the water elevation (Mar. TR at 141–44).

He further observed that sheet flow resulting from tidal action on these creeks would rarely be significant even if the property were in its original condition, because of the resistance offered by the soil and vegetation to the overflowing waters of the creeks and because of the relative brevity of the tidal cycle.[19] The resistance of soil and vegetation would cause the rising water at high tide to take the path of least resistance north through the creek bed, according to Mr. Skiles, with resulting minimal sheet flow south of the new roadway. The same resistance would impede overflow of the rising water at the head of the creek, north of the new roadway. According to Mr. Skiles' theory, the reverse cycle from high to low tide would begin to reduce the water elevation before substantial sheet flow could occur (Mar. TR at 118–25, 141–44).

17. Mr. Skiles testified that one culvert of a pair of culverts should be lowered to improve its efficiency (Mar. TR at 122).

18. Mr. Skiles did not base his calculations upon the annual mean peak high tide and highest peak high tide as did Mr. Hansen. Mr. Skiles instead utilized the highest average daily tide for March 1980, noting that tides in March and September are generally the highest in the year. Averaging the highest tides for the

month as published for the Crystal River Gauging Station, Mr. Skiles arrived at the figure of 2.11 feet above mean sea level as the representative extreme high tide elevation at the Weisman property (Feb. TR at 118–121; DX–H).

19. Judging from the water elevation chart for March 6, 1980, contained in Mr. Skiles' report, the interval between high and low tides on that day was approximately six hours (DX–H).

The question for the Court, in determining the winner in this duel between experts, is which analysis most accurately depicts the hydrological effects of the new roadway in light of all the evidence. While not entirely rejecting Mr. Skiles' scenario of the tidal flow at high tide, the Court finds it somewhat contradictory of his own description of the terrain in question. In propounding his theory of tidal flow, he relied heavily upon the spot elevations of his topographical survey, taken at 100-feet intervals, to demonstrate that the rising waters would be for the most part confined in the creek beds and relatively small areas at the heads of the creeks (Mar. TR at 140–44, 150). Yet, he and other witnesses have described the terrain as being characterized by numerous mounds and depressions in close proximity to each other (Mar. TR at 147–53). Further, his description of the vegetation at one point implied that it was so thick that it would impede the rising waters of the tidal creeks (Mar. TR at 125). At another point he spoke of areas that were "virtually bare" (Mar. TR at 151–52). Given this description, it is difficult to accept his version of tidal action on the property. Rather, the picture which emerges from the evidence is that of the tidal creek expanding from its meandering bed with the rising tide to fill the depressions and swales, moving in a multitude of courses from south to north. From the evidence it seems apparent that the new roadway fill covers numerous depressions and swales, low areas other than the tidal creed beds, which would facilitate sheet flow across the area now covered by fill and onto the property north of the new roadway. The observation of ponded water on both sides of the road by several different witnesses supports the Court's finding. Even assuming that the ponding could be the result of heavy rain rather than tidal action, it is nevertheless evidence that water flow is being restricted. The Court cannot accept the apparent general conclusion of Mr. Skiles' testimony that the new roadway creates, at most, a minimal restriction on sheet and channel flow.

Though the area of the new roadway actually inundated by sheet flow may not be very broad at the mean peak high tide, it does not follow that a small restriction is to be discounted. The matter under scrutiny is whether *any* alteration has occurred in water flow. The significance of that alteration in terms of environmental harm is a separate question. Furthermore, the analysis of the degree of restriction is not limited only to that occurring at the mean peak high tide. The extent of inundation at higher tides, though these occur with less frequency than the mean, may be more significant. In summary, the Court finds that the environmental alteration which has and will result from the construction of the new roadway is: (1) the loss of approximately 2.2 acres of wetland forest, which was cut and is now covered by the new roadway, and (2) the restriction of water flow and the alteration of water flow patterns across the wetland portion of the Weisman property and the wetlands to the south.

Having defined the environmental alterations attributable to the new roadway, the next step is to examine them in terms of their harmful impact. The most practical way of assessing the impact of the new roadway on the value and function of the affected wetland is by reference to the general policies for the evaluation of permit applications set forth in the Code of Federal Regulations with respect to Section 404 permits:

(1) Wetlands are vital areas that constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest.

(2) Wetlands considered to perform functions important to the public interest include:

(i) wetlands which serve important natural biological functions, including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic and land species;

(ii) wetlands set aside for the aquatic environment or as sanctuaries or refuges;

(iii) wetlands, the destruction or alteration of which would affect detrimental-

ly natural drainage characteristics, sedimentation patterns, salinity distribution, flushing characteristics, current patterns, or other environmental characteristics;

(iv) wetlands which are significant in shielding other areas from wave action, erosion, or storm damage. Such wetlands are often associated with barrier beaches, islands, reefs, and bars;

(v) wetlands which serve as valuable storage areas for storm and flood waters;

(vi) wetlands which are prime natural recharge areas. Prime recharge areas are locations where surface and ground water are directly interconnected; and

(vii) wetlands which through natural water filtration processes serve to purify water.

33 C.F.R. § 320.4(b)(1) and (2). A review of the evidence reveals that the wetlands on the Weisman property performed significant functions identified in subsections (i), (iii), and (v), each of which will now be discussed.

The wetland forest on the Weisman property is like productive farm land, producing a crop which is harvested not by man but by the natural action of the seasons and the tides. Plaintiff's expert biologist, Mr. Robert Lazor, explained that the trees located within this wetland area drop their leaves in the fall forming an organic material known as detritus. This detritus, if not absorbed within the wetland area, normally would be flushed out into the estuaries and waters of Kings Bay and the Crystal River through the tidal creek, by the combination of natural water movement previously described as sheet and channel flow. The detrital material, according to testimony, forms the base of the food chain and is relied upon by many aquatic organisms. Though shrimp and fish are the first to profit from this bounty, man is the ultimate beneficiary. The new roadway fill covered and destroyed approximately 2.2 acres of wetland vegetation, thereby eliminating this acreage from performing these food chain production functions. Further, despite the culverts placed under the new

roadway fill, the roadway impedes channel and sheet flow by which surface water may carry and distribute detritus (Feb. TR at 119–27). Dr. Andre Clewell testified for the plaintiff concerning the significance of these effects upon the continued existence and biological function of this wetland. Dr. Clewell is eminently qualified to testify on this topic, having specifically studied and reported on the effect of road fills on tidal marshes, working under contract with the Florida Department of Transportation (Mar. TR at 60–63). Dr. Clewell agreed with Mr. Lazor's conclusions concerning the new roadway's harmful effect upon detrital export (Mar. TR at 64). With specific reference to the reduction of sheet flow illustrated by Mr. Hansen on the topographical survey, Dr. Clewell verified the significance of this restriction imposed by the roadway on the transport of detritus into the estuary (Mar. TR at 65). Moreover, the proportionately greater reduction of sheet flow during periodic tides of 2.6 to 2.8 feet would be very important in terms of harm, according to Dr. Clewell, even if such tides occurred only once a year (Mar. TR at 65–69). He also noted that a reduction in volume and velocity of channel flow attributable to the roadway would reduce the amount of suspended detrital material transported by the water (Mar. TR at 66). The Court concludes that the continued existence of the new roadway has and will continue to have a serious adverse impact upon important natural biological functions of the affected wetlands, especially the production and export of detritus.

The intricate web of interdependence which characterizes our environment requires that we look beyond the present and immediate in assessing the value of any particular element of the environment or in gauging the harm that will accrue from its destruction. Injury to the production and export of detritus from these wetlands, discussed above, is but one example, in that the biological health of Kings Bay and the Crystal River can be adversely affected (Feb. TR at 120). Similarly, the new roadway's interference with the natural flow of water through the area now covered by fill will ultimately change the flushing charac-

teristics of the wetlands north and south of the roadway. The reduced elevation and flow of water over a period of time will dry out the soil in the area north of the roadway and convert it to upland. Conversely, the wetland area south of the new roadway may be adversely affected by higher water elevations, again caused by the interference of the new roadway with the expansion of rising waters in the tidal creeks. These higher water elevations may be too high to sustain emergent wetland vegetation and may eliminate existing species of plants and habitat of animal species (Feb. TR at 14–19, 124–25, 133). Dr. Henry Mushinsky, one of the defendants' biological experts, testified on cross-examination that wetlands at lower elevations are more productive, in terms of both plant life and animal organisms, than wetland at higher elevations (Mar. TR at 111–12). The Court finds that the destruction and alteration of these wetlands has and will detrimentally affect other important environmental characteristics of surrounding wetlands.

Most of us are accustomed to defining a river by the width of its flowing waters, just as we mark the edge of the sea by the shore where its waves meet the land. In fact, the boundaries of these waters are much more elusive. The neighborhood of the river, the transition area between flowing water and dry land, is as important as the river itself to the continued productivity of both land and water. The 14.5 acres of wetland on the Weisman property have been described as a part of the Crystal River flood plain. Mr. Hansen testified that despite the culverts, the new roadway definitely interferes with tidal creek channel flow and substantially blocks sheet flow through this wetland area (Mar. TR at 18–19, 23–33). The new roadway will effectively reduce the valuable wetland storage

area north of the roadway with respect to storm and flood waters. By the same token, it will increase the burden of storm and flood water storage in the area to the south.

These findings of harm effectively foreclose one alternative: the alternative of doing nothing. Clearly some specific remedy is required. The Court now moves to consideration of the proposed plans in terms of their benefits.

Simply stated, the plaintiff's restoration plan proposes to undo the defendants' environmental alterations to the wetland and to restore the area, as nearly as possible, to the way it was before the roadway was constructed. Removal of all the fill would immediately restore normal water flow. Restoration of the wetland forest, even aided by replanting, will be a much longer process, requiring from ten to 30 years for full recovery (Feb. TR at 158). There has been no testimony whatsoever to the effect that this plan would not work, that is, that it would not produce the predicted results. The Court is not hesitant to conclude, in view of the previous discussion of the environmental harm that has resulted from the defendants' alterations to these wetlands, that returning the wetland area as nearly as possible to its original state would be of maximum benefit to the environment.

Defendants argue that their alternative will be equally beneficial and, in addition, will avoid the possibility of further harm to the soil and plants that could result in the process of removing the roadway fill (Mar. TR at 90, 99). Their evidence leaves too many doubts to win the Court's agreement. The alternative calls for improving the culvert system under the new roadway and trading other portions of the Weisman property for the wetlands now covered by the new roadway fill.[20] Specifically, the

---

**20.** Any plan approved by this court must include restoration of the wetland forest destroyed by the new roadway. Although two of the plaintiff's experts testified that replacing substantial sections of the roadway with bridges would restore water flow to nearly normal condition, that change alone would not address the loss of the forest acreage (Mar. TR at 28–34; 68–76). Moreover, defendant Weis-

man's proposed plan does not suggest the use of bridges. The plaintiff's experts also agreed that theoretically a sufficient number of culverts could restore nearly normal channel flow, but that sheet flow could not be practically restored using culverts. (Mar. TR at 28–34; 68–76). Other practical and biological problems exist with respect to culverts and bridges, such as, the effect of bridge pilings, the addi-

defendants purpose to remove the old roadway fill down to an elevation of 1.5 feet (lower than the natural elevation underlying the old roadway) and to remove a nonessential portion of the new roadway where the roadway divides into two lanes for a distance of some 250 feet in the vicinity of the tidal creek beds on the eastern side. The defendants then propose to replant these areas with wetland species. Even using the defendants' figures (see Defendants' Proposed Findings of Fact at page 9), which understate the acreage covered by the new roadway, this plan does not result in an even trade. The converted wetland area would be more than 20,000 square feet less than the original. The Court rejects the defendants' characterization of this difference as "minimal."

Even assuming that the defendants' plan would restore an area of wetland forest equal to that lost in the construction of the new roadway, the evidence does not support the defendants' contention that normal water flow would be restored by the proposed improvements, that is, lowering one existing culvert and installing five additional culverts under the new roadway. The Court finds that with these alterations the culvert system could handle the calculated peak tidal flow above mean high water. From all the evidence, however, these changes would not result in the restoration of normal sheet flow which is critical to the maintenance and biological functioning of the wetland system. Nor is it clear that the removal of the old road would so enhance water flow across the property as to make up for this deficiency. In addition to removing the old roadway fill to an elevation below the apparent original terrain elevation underlying the roadway, Mr. Skiles testified that swales might be needed in some areas to assist the tidal water in its passage across the higher terrain, which is reflected on the topographical survey, between the old roadway and the new roadway. (Mar. TR at 146–56). Despite Mr. Skiles' testimony to the contrary (Mar. TR at 153–56), it seems likely that such "improvements" in

the natural water flow could result in the gradual drying out of the surrounding terrain by providing a more efficient avenue for drainage (Mar. TR at 71–73). With regard to the argument that removing the new roadway fill could result in further damage to the underlying wetland area and the area immediately adjacent to it, the same predictions apply equally to the defendants' plan to take up the old road. The Court must conclude that in terms of both wetland forest and water flow, the plaintiff's restoration plan would afford maximum environmental benefits.

*Practicality*

The plaintiff's plan is superior to the defendants' plan from a practical standpoint because, as the above discussion demonstrates, there is less doubt concerning the results. However, this is not the finding which *United States v. Sexton Cove Estates, Inc., supra,* mandates, as the Court understands it. The question is whether the proposed restoration plan, which theoretically could provide the maximum environmental benefits, is achievable as a practical matter. *Id.* at 1301. This calls for consideration of the feasibility and cost-effectiveness of the proposed plan. In this regard, Mr. John Hendry, a civil engineer in the Corps' cost engineering section, testified in detail concerning the cost and methodology necessary to implement the plan (Feb. TR 161–67). Based upon a volume of approximately 6,000 cubic yards of fill and assuming that tree stumps were left standing to a height of 12 to 18 inches under the new roadway (making removal of the fill more difficult), Mr. Hendry estimated that the new roadway and culvert system could be removed using a half-yard capacity backhoe for a cost of $19,635.00, less the salvage value of the fill, culverts, and culvert headwalls (Feb. TR at 161–67). Mr. Hendry confirmed the testimony of other witnesses that removal of the fill is feasible, and, as previously noted, there has been no testimony to the contrary (Feb. TR at 161).

tional width required for bridging, siltation of culverts, channel maintenance and the prevention of erosion around culvert openings, and

the clogging of culverts with debris (Mar. TR at 52–56; 68–76).

*Equity*

Defendant Weisman's poor equitable position in this case has been previously discussed. The Fifth Circuit has severely limited defenses like those which he has raised in a trilogy of recent decisions. *United States v. Sexton Cove Estates, Inc.*, 526 F.2d 1293 (5th Cir. 1976); *Weiszmann v. Dist. Eng. U. S. Corps of Eng.*, 526 F.2d 1302 (5th Cir. 1976); *United States v. Joseph G. Moretti, Inc.*, 526 F.2d 1306 (5th Cir. 1976). The Court's rejection of those defenses, however, does not completely answer the question of whether the proposed restoration remedy is equitable in light of the degree and kind of wrong. This is by far the most difficult question presented in this case. Even the Corps has admitted that, had no alternative to the new roadway existed, a permit would have been granted for the new roadway specifying either culverts or bridges to maintain as nearly as possible the natural water flow across the property (Feb. TR at 183–84). The old roadway was a viable alternative to the destruction of 2.2 acres of wetland forest, however, and defendant Weisman's actions must be judged in light of his adamant refusal to utilize an environmentally acceptable alternative. Further, the equity of requiring that the new roadway be taken up is enhanced by the fact that this alternative still exists. Defendant Weisman will still have access to his property, and with a permit from the Corps it can be modified to meet some, if not all, of his desires. Nor is there any doubt that defendant Weisman can afford the cost of restoration (Feb. TR at 194–94).

Despite the fact that defendant Weisman's violation of federal law has been of the most flagrant and defiant sort, there is still the inclination to say, as Mr. Hilger said in his letter of November 29, 1979, to the Corps, that "[t]he only issue involved here is the choice of a site for a road on private property." To agree with that conclusion, however, would be directly contrary to the Congressional purpose "to restore and maintain the . . . integrity of the Nation's water." Section 101(a), FWPCA, 33 U.S.C. § 1251(a). For better or worse, the government has chosen regulation as the means to protect the nation's water resources from pollution. There are other ways to achieve the same goal. The Congress could impose a pollution tax upon those unwilling or unable to avoid harming the quality of the nation's water. Those able to afford the additional expense could then pollute at will, in effect buying the right to pollute. If the cost were high enough, doubtless pollution would decrease because fewer people could pay the price. The inequity of that solution needs little discussion and is beside the point in any case. That is not the way in which Congress chose to implement the purposes of the FWPCA. To allow defendant Weisman to keep his road and thereby deny beneficial restoration of a national resource which he altered, against all advice of the agency charged by Congress to enforce these laws, is simply unacceptable in these circumstances.

Nor can the degree of the defendant's wrong be minimized by arguing that his actions affected only 14.5 acres of protected wetland. As Dr. Clewell testified, "[t]he most recent figures . . . show that something like thirty-five percent of the nation's wetlands have been removed by such activities." (Mar. TR at 74). In circumstances like the instant case, the cumulative loss must be considered. The Court finds, therefore, that the plaintiff's proposed restoration plan is equitable in light of the degree and kind of wrong.

The Court concludes from all the evidence that restoration is necessary and justified in this case. With regard to civil penalties, there is ample evidence in the record to indicate that defendant Weisman violated Sections 301(a) and 404 of the FWPCA, 33 U.S.C. §§ 1311(a) and 1344 on at least nine separate days.[21] Section

---

21. Defendant Weisman admitted that construction on the new roadway began three or four days before the telephone call from Mr. Bacheler on December 14, 1979, on or about Monday, December 10, 1979 (Feb. TR at 200, 203).

Richard W. Clutter, the Corps biological technician, testified that he observed dumptrucks dumping fill materials and front-end loaders pushing the fill into the wetlands on the Weisman property on Friday, December 14, 1979

309(d) of the FWPCA, 33 U.S.C. § 1319(d) authorizes imposition of a penalty of $10,-000.00 for each day on which a violation occurs. In light of the fact that defendant Weisman will, as a result of this decision, be required to bear the cost of implementing the restoration plan and suffer the loss of the new roadway, the Court will impose a fine of $10,000.00.

The foregoing opinion constitutes this Court's findings of fact and conclusions of law. A final judgment implementing the decisions reflected therein shall issue forthwith.

(Feb. TR at 34–35). Mr. Clutter also testified that when he returned to the site on Monday, December 17, 1979, he observed additional fill being dumped by trucks and spread by front-end loaders (Feb. TR at 34–35). Defendant Weisman admitted that road construction work, specifically including compacting and leveling with heavy earth-moving equipment continued until he ordered his contractor to cease work sometime on December 21, 1979 (Feb. TR at 207–08).

APPENDIX A, Location Sketch of Weisman Property (Extracted from Topographic Survey, Defendants' Exhibit F).

A PORTION OF SEC. 29 - TWP. 18S - RGE. 17E

LOCATION SKETCH

SCALE : 1" = 300'