**In the Matter of ALAMEDA COUNTY ASSESSOR'S PARCEL NOS. 537–801–2–4 AND 537–850–9, et al.**

**No. C–86–144 MISC. WHO.**

United States District Court,
N.D. California.

June 3, 1987.

Francis B. Boone, Asst. U.S. Atty., Land & Natural Resources Div., San Francisco, Cal., for applicants.

David M. Ivester, Washburn & Kemp, San Francisco, Cal., for petitioners.

ORRICK, District Judge.

Petitioners, the owners of a 286–acre farm in Newark, California, seek to quash an administrative warrant obtained by applicants, the United States Environmental Protection Agency ("EPA"), on August 20, 1986, for the purpose of entering petitioners' farm and determining what areas of the farm, if any, fall under the jurisdiction of the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251 *et seq.*, commonly referred to as the "Clean Water Act" ("CWA"). For the reasons following, the motion to quash the warrant is denied.

I

The actual owners of the farm, and the petitioners in this action, are Boyd C. Smith, Trustee for the Richard T. Peery 1976 Children Trusts; Louis B. Sullivan, Trustee for the John Arrillaga 1976 Children Trusts; and Frank Joseph Siri, Jr., Trustee for the Siri Family Trust. Peti-

tioners' farm, located in the city of Newark, California, is bounded by various private farms to the north, a railroad track on the east, and the man-made Alameda County Flood Control District levees running along Mowry Slough to the south and to the west. Declaration of Veronica D. Reynolds, filed Aug. 20, 1986 (hereinafter "Reynolds Declaration"), at 3–4, ¶ 4, and attached maps. It is undisputed that much of petitioners' property has been farmed by lessee farmers for at least the past twenty-five years, and possibly longer.

The present controversy arose in late 1984 when the farmer leasing petitioners' farm disced certain fields on the farm that allegedly contain "wetlands," as they are defined under the CWA,[1] installed new culverts and tide gates, and expanded a drainage ditch network in the alleged wetlands area. An agent of the United States Fish and Wildlife Service ("USFWS"), Ecological Services Branch, observed these activities and informed the Army Corps of Engineers ("Corps") on November 9, 1984, of their occurrence. Declaration of David M. Ivester in Support of Motion to Quash Administrative Warrant, filed Sept. 9, 1986 (hereinafter "Ivester Declaration"), Exhibit D. On December 3, 1984, the Corps sent investigators to petitioners' property in order to examine the area of the activities and assess whether wetlands were being destroyed.

The investigators, Corps personnel, concluded that the farmer had engaged in "unauthorized activity involving the sidecasting of fill material associated with the construction of new ditches and [the] placement of tide gates to facilitate the drainage of a wetland located" on petitioners' prop-

---

1. The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Pursuant to that goal, the CWA intends that "the discharge of pollutants into the navigable waters be eliminated." 33 U.S.C. § 1251(a)(1). The CWA defines "navigable waters" to mean "the waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court has stated that a "definition of 'waters of the United States [or the 'Nation's waters'] encompass[es] all wetlands adjacent to other bodies of waters over which" there is jurisdiction under the

CWA. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 463, 88 L.Ed.2d 419 (1985). Thus, if there exist wetlands on petitioners' property adjacent to "waters of the United States," the United States will have jurisdiction over any activities entered into in contravention of the CWA. The actual determination of the wetland status of a specific parcel of property will be governed by the regulations promulgated by the EPA and the Corps pursuant to their authority under the CWA. *See* 40 C.F.R. § 230.3(t), 33 C.F.R. § 323.2(c).

erty. Ivester Declaration, Exhibit B at 1 (Corps cease and desist letter dated Dec. 21, 1984, to petitioners (hereinafter "Corps letter")). Based on these findings, the San Francisco Office of the Corps concluded that "extensive damage has occurred to the wetlands on [the] property" and, therefore, issued a "cease and desist" letter to petitioners on December 21, 1984. *Id.* The letter informed petitioners that all of the farmer's activities were in violation of § 404 of the CWA, 33 U.S.C. § 1344,[2] and directed petitioners' to stop all actions in connection with the aforementioned activities. *Id.*

In response to the Corps letter, petitioners eventually admitted that the farmer had replaced a culvert and tide gate, enlarged a levee by placing fill material on top of it, and altered and expanded an existing drainage ditch. However, petitioners argued that these activities were permissible under the "farming exceptions" provided for under § 404(f), 33 U.S.C. § 1344(f), of the CWA.[3] Ivester Declaration, Exhibit H. Petitioners also argued that the alleged unlawful discing was something the lessee farmer "had done many times before, in order to prepare the land for seeding." *See* Petitioners' Memorandum of Points and Authorities in Support of Motion to Quash Administrative Warrant (hereinafter "Petitioners' Memorandum"), filed Sept. 15, 1986, at 4. The Corps maintained that all these activities were in violation of the CWA, and a long series of correspondence ensued between petitioners and the Corps.

After numerous communications, petitioners agreed that the Corps could enter the property for the limited purpose of investigating the contested activities. On March 24, 1986, the Corps conducted the planned visit, accompanied by David Ivester, attorney and representative for petitioners, and by representatives of the EPA, the USFWS, and the California Department of Fish and Game ("DFG"). During that visit, Ivester allowed the state and federal agencies' representatives to enter the farm and observe the area of the alleged violations outlined in the Corps letter, but refused to allow the agencies' representatives to collect soil samples or conduct tests in order to determine whether the property was a "wetland" under the provisions of the CWA.

The EPA representatives accompanied the Corps on the March 24 visit, at the Corps request, for the express purpose of providing "technical support and expertise in determining" the existence of wetlands on the property and determining "the extent of federal jurisdiction" over petitioners' property under the CWA. Declaration of Thomas G. Yocom, filed Aug. 20, 1986, (hereinafter "Yocom Declaration") at 6, ¶ 11. Representatives of the DFG and the USFWS accompanied the Corps and the EPA, at the Corps request, in order to render assistance in identifying "wetland plants and animal life on the site" that would indicate whether the area was a wetland under the provisions of the CWA. *Id.* at 7, ¶ 14. The Corps and the EPA wished to make the technical determination of the wetland status of petitioners' property in order to determine the existence and extent of petitioners' violations of the CWA, as well as to determine the federal jurisdiction

---

**2.** Section 404 of the CWA, 33 U.S.C. § 1344, governs the issuance of permits for "dredged or fill material." The section is an extensive and comprehensive regulation of any activities involving the "discharge of dredged or fill materials into the navigable waters" of the United States. 33 U.S.C. § 1344(a). The section provides that the Secretary of the Army Corps of Engineers may issue permits allowing the discharge of fill dirt, among other substances, but that the permits are subject to the veto power of the Administrator of the EPA.

**3.** Pursuant to § 404, there are certain activities that do not require a permit from the Corps in order to discharge fill dirt into navigable waters. 33 U.S.C. § 1344(f). Among these activities are a number of "repair, maintenance, and "cultivation" activities associated with "normal farming, silviculture, and ranching" operations. 33 U.S.C. § 1344(f)(1). If the lessee farmer on petitioners' property was engaged in these type of activities, and the activities comported with the intent of § 404's farming exception in the eyes of the Corp and the EPA, then the lessee farmer is not required to obtain a permit under 33 U.S.C. § 1344(*l*), and the activities would not constitute a violation of the Act.

over petitioners' property under the CWA. If wetlands existed on the property, the agencies wanted to ensure that wetland vegetation and habitat were not being destroyed in order to prepare for future development of the farm.

After viewing the site of the alleged violations of the CWA, but without being allowed to take soil samples or conduct tests, the agencies' representatives ended the March 24 visit and left petitioners' property. After the visit, the Corps again contacted the EPA, and "requested [the] EPA's assistance in obtaining access to the [petitioners'] property for purposes of making a final technical determination as to the extent and location" of wetlands on the property. Yocom Declaration at 7, ¶ 13. The EPA agreed, and the Corps and the EPA contacted petitioners again and informed them that they wished to have access to the property in order to conduct a "jurisdictional" determination of the wetland status of the property. Petitioners refused, and stated that they would oppose any efforts in the courts seeking to gain access to the property for such a determination.

Soon after this exchange, in May 1986, a representative of the Corps learned that a game warden of the DFG, Warden David Fox, had observed the lessee farmer dumping and spreading fill material in the fall of 1984 on the same potential wetland areas that the EPA and the Corps had examined in their March 24, 1986, visit. Reynolds Declaration at 9–10, ¶ 14. The DFG warden, who had monitored petitioners' property since 1981, stated that the farmer had "not disced or plowed [those particular fields] between the fall of 1981 and the fall of 1984." Declaration of David Fox, filed Aug. 20, 1986 (hereinafter "Fox Declaration"), at 2 ¶ 4. Rather than "merely plowing and discing" those areas for routine farming in the fall of 1984, as petitioners have claimed the farmer was doing, the game warden stated that he observed the farmer using "graders and a bulldozer … to spread earthen fill … brought onto the property and dumped from large earthmoving trailer trucks." Id. at 2, ¶ 5. In the eyes of the warden, "the fill was being spread to raise the elevation and to contour the surface of the low-lying areas" where there had previously been significant wetland vegetation. Id.

The warden stated that he had returned to the site a few weeks later, still in the fall of 1984, and had observed that the farmer had covered the wetland vegetation completely, contoured the property to drain away any standing water, altered and deepened the nearby drainage ditch, and removed vegetation from the drainage ditch. Id. at 2–3, ¶ 6. The purpose of these various activities apparently was to turn these potential wetland areas into nonwetland property.

Petitioners' have since claimed that the activity observed by DFG Warden Fox was merely the farmer fertilizing certain fields. Petitioners allege that the farmer was dumping manure transported by dump trucks stored on the property, and then spreading the manure for crop fertilization with a grader. Petitioners' Memorandum at 31. However, petitioners' have failed to convincingly address the warden's statement that he observed several large trailer-trucks and graders dumping and spreading large amounts of fill on the property. Even more important, petitioners have failed to convincingly refute the warden's statement that a few weeks later the area had been extensively graded and contoured, significant amounts of wetland vegetation had been covered up or destroyed, and new drainage ditches had been constructed, all with the apparent purpose of draining existing wetlands.

The EPA and the Corps redoubled their efforts to gain access to petitioners' property after receiving notice of DFG Warden Fox's observations. Shortly thereafter, on August 15, 1986, the EPA received information that still another DFG warden had observed unusual activities on petitioners' property. This time, however, the activities had just taken place within the past few days. The second DFG warden, Paul Kelley, informed an EPA attorney assigned to matters arising under § 404 of the CWA that he had personally observed that the farmers were discing the potential wetland

areas of petitioners' farm unseasonably early. Declaration of Ann S. Nutt, filed Sept. 19, 1986 (hereinafter "Nutt Declaration"), at 2–3, ¶¶ 2–3. Normally, the farmer disced his fields in October, not in mid-August. *Id.;* Declaration of George Cook, filed Sept. 9, 1986 (hereinafter "Cook Declaration") at 2, ¶ 3. The EPA feared that the discing might be an effort to destroy evidence of vegetation or other characteristics that would qualify areas on the property as "wetlands" for the purposes of the CWA. Therefore, the EPA and the Corps immediately prepared to apply for a search warrant allowing them access to the property in order to examine the farmer's activities and to make a jurisdictional determination of the wetland status of petitioners' property.

On August 20, 1986, the United States Attorney, acting on behalf of the EPA, applied *ex parte* for an administrative inspection or search warrant to enter petitioners' farm and determine if parts of the farm were "wetlands," thereby bringing petitioners' property under the jurisdiction of the CWA. The basis of the application for the warrant was the EPA's probable-cause belief that numerous violations of the CWA, under §§ 301,[4] 308,[5] and 404, 33 U.S.C. §§ 1311, 1318, and 1344, were occurring on the farm. The probable-cause belief was supported by affidavits certifying the observations of DFG Warden Fox from the fall of 1984, and the observations and knowledge of the EPA and Corps officials who had observed wetland vegetation on petitioners' property more recently, and were aware of the various unusual activities by the lessee farmer. *See* Ex Parte

Application for Warrant, filed Aug. 20, 1986; Fox Declaration; Reynolds Declaration; Yocom Declaration; Declaration of James E. Broadway, filed Aug. 20, 1986. The warrant was issued by Magistrate Claudia Wilken on August 20, 1986. The EPA executed the warrant on August 25 and 26, and September 1, 1986, by entry on the property and the gathering of soil and vegetation samples for the purpose of determining jurisdiction over petitioners' property under § 404 of the CWA.

Thereafter, petitioners filed this motion to quash the warrant. Petitioners have asserted that all of the original "repair and maintenance" activities outlined in the Corps letter, which gave rise to this dispute, were lawful and routine farming activities, specifically exempted from the restrictions of the CWA under the "farming exceptions" of § 404(f). 33 U.S.C. § 1344(f). They have also claimed that they do not intend to develop the farm, and that they are willing to "concede" the Corps' jurisdiction over the property for the limited purpose of resolving the "repair and maintenance" activities. This is insufficient for the EPA; the EPA insists on being allowed to enter the property for the purpose of determining whether areas of the property are wetlands under the CWA, and whether significant unlawful fill dirt activities have occurred on the property with the intent and effect of destroying wetlands.

Although not clearly stated in the papers, it appears that the "maintenance and repair" activities that gave birth to this dispute have been settled to the satisfac-

**4.** Section 301, 33 U.S.C. § 1311, states that "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, 1344 of this title [or Act], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). The remainder of this lengthy section concerns the creation of standards for the discharge of pollutants, the timetables for compliance with the standards, the EPA's power to make individual exceptions to the standards or the timetables, and the procedures and requirements for the issuance of permits for the discharge of certain pollutants.

**5.** Section 308, 33 U.S.C. § 1318, allows the EPA to require the "owner or operator of any point

source," [i.e., any "conveyance ... from which pollutants are or may be discharged, *see* 33 U.S.C. § 1362(14)] to "(i) establish and maintain such records, (ii) make such reports, (iii) install ... such monitoring equipment ..., (iv) sample such effluents, and (v) provide such other information as he may reasonably require." 33 U.S.C. § 1318(a)(4)(A). The section also provides that the EPA "shall have right of entry to, upon, or through any premises in which an effluent source is located." 33 U.S.C. § 1318(a)(4)(B). Along with 33 U.S.C. § 1319, this section is the primary means of investigation and enforcement available to the EPA under the CWA.

tion of the Corps and the EPA. However, the alleged unlawful fill dirt activities, including the alleged "fill dirt dumping and contouring" and the "unseasonably early discing," have not been resolved. The present dispute centers solely on whether the EPA has the power under the CWA to obtain an administrative search warrant for the purposes of determining if wetlands exist on petitioners' property, and for determining if unauthorized discharges of fill material have occurred on petitioners' property in violation of § 404 of the CWA.

## II

Petitioners argue that the enforcement of § 404 of the CWA lies solely in the hands of the Corps, and that the EPA has no authority under § 404 to obtain a search warrant solely for the purposes of determining the wetland jurisdiction of a specific parcel of property. As a secondary matter, petitioners also challenge the warrant on the grounds that it was not based on probable cause, and that it is "overbroad." The EPA opposes the motion on the grounds that the warrant was issued with probable cause, that the EPA is authorized to obtain a search warrant in order to make a determination of the United States' jurisdiction under § 404, and that the EPA has a supervisory and independent role in the enforcement of § 404. The EPA also asserts that observations of the property during the March 24, 1986, visit indicated that there do in fact exist significant wetlands on the farm.

■ As a preliminary matter, the Court finds petitioners' argument that the EPA or the Corps should be able to make a jurisdictional determination of the property's wetland status with a "stroll" across the farm to be without merit. In order to determine if wetlands exist on a specific parcel of property, the EPA and the Corps routinely are required to take soil and vegetation samples, and to conduct various scientific tests of those samples. *See* Declarations of Reynolds and Yocom. Observations of vegetation, soil, and animal life in the course of investigating the property are useful factors in making a wetland

determination, but they cannot be conclusive in light of the EPA and Corps regulations governing the definition of a "wetland" for purposes of the CWA. *See* 40 C.F.R. § 230.3(t); 33 C.F.R. § 323.2(c). It is beyond serious contention that for a thorough and conclusive determination of the wetland status of a piece of property under the CWA, the proper agency must be allowed to obtain numerous samples of soil and vegetation, and scientifically gather and analyze data about the property. *See United States v. Tull,* 615 F.Supp. 610 (E.D.Va.1983); *United States v. Weisman,* 489 F.Supp. 1331 (M.D.Fla.1980).

### A. *The Statutes.*

Petitioners' motion centers on the argument that the EPA is without authority to conduct a jurisdictional determination of the wetland status of a specific parcel of property under § 404. Petitioners' argument is founded upon a textual analysis of §§ 308 and 404 of the CWA. Although both sections are detailed and lengthy provisions, their basic functions are clear.

The EPA is empowered under § 308 to police the discharge of pollutants into the Nation's waters, and may require the "owner or operator of any point source [discharging pollutants]" to keep records and sample "such effluents" as may be discharged on the property. 33 U.S.C. § 1318. Under § 308, the EPA has "a right of entry to, upon, or through any premises in which an effluent source is located ..., and [may] sample any effluents" covered by this section in order to enforce the restrictions of the CWA. 33 U.S.C. § 1318(a).

Under § 404, the Corps is empowered to "issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S. C. § 1344(a). The Corps is also empowered to make exceptions to the requirements of § 404, and to enforce violations of § 404. The Corps was thus given a special role under the CWA to enforce § 404, that section of the CWA concerning the use of fill dirt in the nation's waters. This role was in keeping with the Corps historic role in

regulating the construction and maintenance of the nation's harbors, and the use of the nation's rivers. *See* River and Harbor Act of 1899 § 10, 33 U.S.C. § 403.

### B  *The EPA's Role Under § 404.*

■ The CWA provides that unless "otherwise expressly provided" in this statute, the EPA will administer the CWA. 33 U.S.C. § 1251(d). The EPA is thus vested with the final responsibility for the enforcement of the CWA, including § 404. Though the CWA envisions that the Corps will be the federal agency primarily involved with the administration and enforcement of § 404, the legislative structure of § 404 and of the CWA also contemplate that the EPA will assume a supervisory role in connection with the administration of § 404. Under § 404, the EPA "is authorized to [veto any permit issued by the Corps and] prohibit the specification ... of any defined area as a disposal site [by the Corps], ... whenever [the EPA] determines ... that the discharge ... will have an unacceptable adverse effect" on the environment. 33 U.S.C. § 1344(c). In addition, § 404 allows the EPA to transfer the fill dirt permit administration procedure to the individual states, and to regulate those state programs instituted under § 404. 33 U.S.C. §§ 1344(n), 1318(a).

The Corps itself recognizes the dual roles of the Corps and the EPA in the administration and enforcement of § 404. The Corps has a history of notifying the EPA of "controversial ... matters under Section 404," and of occasionally "request[ing the] EPA to give technical assistance in making final jurisdictional determinations under Section 404...." Reynolds Declaration at 2, ¶ 1(e). Indeed, the Corps "contacted EPA to request technical support and expertise in making a final jurisdictional determination as to the extent of wetlands on" petitioners' property in this very action. *Id.* at 10, ¶ 16. This relationship between the Corps and the EPA under § 404 disproves petitioners' contention that the Corps is the sole agency authorized to administer or enforce § 404. The Corps is not intended to be the sole and exclusive administrator and enforcer of § 404, but

rather the "primary" administrator and enforcer whose decisions may be reviewed and reversed by the EPA. However, in order to determine the EPA's ability to make jurisdictional wetland determinations, and enforce the unlawful dumping of fill dirt on wetlands, a further examination of the CWA is required.

### C.  *Fill Dirt is a Pollutant.*

■ Petitioners next argue that the terms "pollutant" and "effluent," as used in §§ 308 and 301, were not intended to include the term "fill dirt," but rather that § 404 was drafted as the exclusive section in the CWA governing the discharge of fill dirt. Petitioners argue that the drafters of the CWA intended that only § 404 should govern the dumping of fill dirt into the nation's "waters," and the other provisions of the CWA administered by the EPA, including §§ 301 and 308, are not applicable to fill dirt.

Under § 301, the CWA prohibits the "discharge of [*any*] pollutants" from a "point source" into the nation's waters. The CWA defines "pollutant" to mean "dredged spoil, solid waste, ... rock, sand, cellar dirt ... and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Despite petitioners' arguments to the contrary, numerous courts have determined that fill dirt is a "pollutant" under the terms of § 301. *See Tull,* 615 F.Supp. at 622; *United States v. Bradshaw,* 541 F.Supp. 880, 882–83 (D.Md.1981); *Weisman,* 489 F.Supp. at 1337. *Accord Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983). The "discharge of a pollutant" under § 301 is defined as including "any addition of any pollutant to navigable waters from any *point source.*" 33 U.S.C. § 1362(12) (emphasis added). The term "point source" has in turn been defined under the CWA as including "any discernable, confined and discrete conveyance, ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). In situations where an individual has been unlawfully dumping fill dirt on wetlands, the courts have consistently found that dump trucks, trailer trucks, bulldozers, and earth graders all qualify as "point sources" for

purposes of the CWA. *See Avoyelles,* 715 F.2d at 922; *Tull,* 615 F.Supp. at 622; *Weisman,* 489 F.Supp at 1337; *United States v. Robinson,* 570 F.Supp. 1157, 1163 (M.D.Fla.1983); *United States v. Holland,* 373 F.Supp. 665, 668 (M.D.Fla.1974).

Thus, when faced with factual scenarios identical to that presented in this action by the activities of the lessee farmer, the courts have concluded without exception that the unlawful dumping of fill dirt on wetlands without a permit under § 404 is a "discharge of a pollutant" in violation of § 301 under the CWA. *See Avoyelles; Tull; Weisman; Robinson; Bradshaw; Holland. See also Track 12, Inc. v. District Engineer, United States Army Corps of Engineers,* 618 F.Supp. 448 (D.Minn.1985); *United States v. Lambert,* 589 F.Supp. 366 (M.D.Fla.1984); *United States v. Ciampitti,* 583 F.Supp. 483 (D.N.J.1984).

### D. *Section 404 is an Exception to § 301.*

Further refutation of petitioners' argument that § 301 does not apply to the dumping of fill dirt is found in the relationship of § 404 to § 301. It has been repeatedly noted, most recently by the Supreme Court, that the CWA is a comprehensive statute, intended to regulate and eliminate as soon as possible all pollution of "the Nation's waters." *Riverside Bayview Homes,* 106 S.Ct. at 462, *citing* CWA § 101, 33 U.S.C. § 1251. Although the CWA literally prohibits only discharges into "navigable waters," *see* 33 U.S.C. §§ 1311(a), 1344(a), 1362(12), the Supreme Court has stated that Congress intended the term to be construed broadly. Thus, "a definition of 'waters of the United States' encompass[es] all wetlands adjacent to other bodies of waters over which" there is jurisdiction under the CWA, and the provisions of the CWA will apply with full force to wetlands as well as to other "waters." *Riverside Bayview Homes,* 106 S.Ct. at 463.

The "discharge of any pollutant by any person" into the waters of the United States is prohibited by § 301, *"except* as in compliance with this section and ...

[among others, section] 1344 of this title [i.e., § 404]." 33 U.S.C. § 1311(a) (emphasis added). Under *Riverside Bayview Homes,* § 301 prohibits the discharge of *any* pollutant into the nation's wetlands, as well as into "navigable waters," unless pursuant to an exception specifically provided for in the CWA. By its very terms, § 404 is an *exception* to the prohibitions of § 301. *See* § 404(f)(1), § 1344(f)(1)]. In addition, the routine farming exceptions provided for in § 404(f) specifically note that these exceptions will relieve the actors from liability under the provisions of § *301,* which is regulated by the EPA. The obvious meaning of the interaction of these two regulations is that those activities that do not fall under the permit or farming exceptions of § 404 *will* violate § 301, and thus fall under the enforcement power of the EPA. *See Weisman,* 489 F.Supp. at 1337.

### III

Petitioners also argue that 'the Corps is the sole agency vested with authority to make a jurisdictional determination under § 404 of the existence of "wetlands" and, therefore, the EPA is an improper agency for the issuance of the search warrant.

### A. *Jurisdictional Determinations.*

As already explained above, the EPA plays a supervisory role in the administration and enforcement of § 404. In addition, the regulations promulgated pursuant to the CWA by both the Corps and the EPA governing the definition and determination of "wetlands" were drafted in conjunction, and contain virtually identical language. As applied, both agencies definitions and jurisdictional determinations will result in the same result. *Avoyelles,* 715 F.2d at 911 n. 27; *compare* 33 C.F.R. § 323.2(c) (1982) *with* 40 C.F.R. § 230.3(t), 230.41(a)(1) (1982).

Furthermore, the EPA, the Corps, and the Attorney General of the United States all agree that the EPA is the "ultimate administrative authority" in determining the existence of wetlands, or the "reach of the navigable waters for the purposes of § 404." 43 Op. Att'y Gen. No. 15 (1979); *Avoyelles,* 715 F.2d at 903 n. 12. Indeed,

as noted earlier, the Corps even requests the EPA's assistance in these determinations from time to time, and notifies the EPA of "controversial" determinations. *See* Reynolds Declaration. A court should show great deference to the interpretation of a statute by the agency charged with its administration. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). If both the Corps and the EPA have agreed that the EPA is the "ultimate" authority for the determination of the "wetland" status of property, this Court is bound to give great weight to that conclusion. This Court finds that the EPA has authority under the CWA and § 404 to make a jurisdictional determination of the wetland status of petitioners' property.

In this action, the EPA must first determine if there are wetlands on the property in order to then determine if a violation of either §§ 301 or 404 has occurred. The EPA believes that violations of §§ 301 and 404 have occurred on petitioners' property. A violation of §§ 301 or 404 will occur on petitioners' property *only* if "navigable waters" exist on the property. As stated earlier, "navigable waters" under the CWA include wetlands. *See Riverside Bayview Homes.* Therefore, the only way to finally determine if violations of §§ 301 and/or 404 have occurred on petitioners' property is to make a technical "jurisdictional" determination of the wetland status of the property.

### B. *A § 308 Search Warrant.*

Petitioners argue that the EPA has no authority to obtain an administrative search warrant under the CWA solely for the purpose of determining jurisdiction, i.e., whether the property contains wetlands. Neither side disputes the EPA's right of entry under the provisions of § 308. If the EPA has satisfied the restrictions governing its right of entry under § 308, then the EPA may enter petitioners' farm if entry under a § 308 warrant permits a jurisdictional determination under § 404.

A warrant under § 308 allows the EPA access to "any premises in which an effluent source is located." 33 U.S.C. § 1318(a)(B)(i). Although not immediately clear, it appears that the CWA uses the terms "effluent" and "pollutant" interchangeably. Under § 301, the terms "pollutant" and "effluent" are used without differentiation. For example, the title of the section is "effluent limitations," but the very first subsection concerns the "illegality of pollutant discharges." 33 U.S.C. § 1311(a). Other paragraphs throughout § 301 also address "pollutants" and "pollutant discharge".

More telling is the fact that although there is a specific and detailed definition of "pollutant" in the definition section of the CWA, there is no analogous definition for the word "effluent." *See* 33 U.S.C. § 1362(6). The only relevant definition addresses the term "effluent limitation," defined as any "restriction ... on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters." 33 U.S.C. § 1362(11). A point source is defined as that which discharges *pollutants. See* 33 U.S.C. § 1362(14). The Court finds that the term "effluent" is intended to include "pollutants," and the definition of "effluent limitation" is obviously broad enough to encompass the terms "pollutants" and "discharge of pollutants" as defined under the CWA. *See* 33 U.S.C. § 1362(6), (12).

Under the CWA, "fill dirt" is a pollutant as well as an "effluent." The Court finds that the EPA has good cause to believe that petitioners have unlawfully dumped fill dirt on wetlands and/or destroyed wetland vegetation in violation of § 301. *See Avoyelles,* 715 F.2d at 922–27. The dumping of fill dirt on wetlands is a discharge of a pollutant and/or an effluent, and the machines used to accomplish the dumping are "point sources" and/or "effluent sources." *See* II C., *supra.* Under § 308, the EPA "or his authorized representative" has the right of entry "to, upon, or through any premises in which an effluent source is located." 33 U.S.C. § 1318(a)(B)(i).

In this action, assuming the warrant was issued with due process, the EPA has authority under § 308 to obtain a warrant to enter petitioners' farm in order to investi-

gate the potential "effluent sources" therein, and any potential violations of §§ 301 or 404. As explained earlier, the determination of a violation of § 301 in these circumstances will necessarily involve a jurisdictional determination under § 404 because there will be no unlawful discharge of fill dirt unless it is first determined that there exist "navigable waters" or wetlands, on petitioners' farm. The EPA is justified under the present circumstances in conducting a jurisdictional determination of the wetland status of petitioners' farm pursuant to an administrative search warrant granted under § 308.

## IV

As a secondary matter, petitioners contest the factual and *ex parte* issuance of the warrant by the magistrate, and the warrant's permission for the entry of private individuals, not employed by the EPA, to assist the EPA in their jurisdictional determination of wetlands on petitioners' property.

### A. *The Warrant.*

■ Petitioners attack the *ex parte* issuance of the warrant by the magistrate, and the EPA's factual justification for the warrant. First, the EPA is not required to give advance notice of an application for a search warrant, but may proceed *ex parte* where appropriate. Under the CWA and § 308, the EPA has the authority to seek an *ex parte* administrative search warrant. *See Bunker Hill Co. Lead & Zinc Smelter v. U.S. Environmental Protection Agency*, 658 F.2d 1280, 1285 (9th Cir.1981). Second, the grant of an administrative search warrant is governed by lesser standards than the "probable cause" standard in criminal law. The agency may be entitled to a warrant if " 'reasonable legislative or administrative standards for conducting an ... inspection are satisfied with respect to a particular [establishment],' " as well as if "probable cause ... [is] based ... on specific evidence of an existing violation." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978).

■ In this action, the EPA has produced more than sufficient evidence justifying the issuance of the warrant. *See* Declarations of Fox, Reynolds, and Yocom. At the time of the issuance of the warrant, the EPA had, and still has, good reason to believe that certain areas on petitioners' property are wetlands, and that wetlands are being destroyed by the lessee farmer.

In addition to the observations of the USFWS agent in November 1984 (*see* Ivester Declaration, Exhibit D), the EPA official in charge of the EPA's responsibilities under § 404 of the CWA has twice observed, on separate occasions prior to the March 24 visit, vegetation and other characteristics of wetlands on petitioners' property. Yocom Declaration at 3–4, ¶¶ 4–6, 5–6 at ¶¶ 9–10. He concluded, based on his observations, that wetlands very likely do exist on petitioners' property. *Id.* The EPA and Corps agents who visited petitioners' property on March 24, 1986, themselves observed what they believed to be significant and convincing evidence of wetland soil and vegetation, and concluded that it is very likely that wetlands do exist on the property. Reynolds Declaration at 6–7, ¶¶ 10–11. In addition, the observations of DFG Wardens Fox and Kelley raise strong and well-founded suspicions that the lessee farmer is systematically destroying potential wetlands on petitioners' property. The Court finds that the application for the warrant was supported by competent and sufficient evidence, and was providently granted by the magistrate.

### B. *Private Individuals.*

■ Under the authority of *Bunker Hill, supra,* the Court finds that "authorized representatives" for the purpose of § 308 include private contractors and experts necessary for the EPA to make jurisdictional and violation determinations. Although the legislative history of § 308 refers to "full-time employees," S.Rep., Public Works Committee, No. 92–414 (Oct. 28, 1971), *reprinted in* 1972 U.S.Code Cong. & Admin.News 3729, the Court finds that the phrase "authorized representative" as used in the actual language of § 308 was meant to include a wider range of individuals. In

**1288**

*Bunker Hill,* the Ninth Circuit interpreted the analogous provisions in the Clean Air Act to include private contractors hired by the EPA to assist in the enforcement of the Act, despite the restrictive language of the legislative history that referred only to "employees" of the agency. Similarly, the Court here also interprets the apparently restrictive language of § 308 to include private contractors hired by the EPA to assist in the technical determinations necessary for the enforcement of the CWA. Petitioners' farm contains no "trade secrets," and the entry of the private experts solely for the purpose of assisting in the enforcement of the CWA will not unduly infringe on petitioners' rights of ownership or privacy in the 286–acre "open field" farm. *See Bunker Hill,* 658 F.2d at 1284–85. The EPA has used the same types of experts numerous times in the past for similar purposes, and has concluded that the use of these experts comports with the intent of Congress under § 308. The Court agrees. *See Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**V**

For the reasons stated above, and good cause appearing therefor,

IT IS HEREBY ORDERED that petitioners' motion to quash is denied.